Filed 12/28/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MARCO ANTONIO SANDOVAL,<br><br>  Defendant and Appellant. | D071560<br><br>(Super. Ct. No. JCF36531)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 30, 2017, be modified as follows:

1.  On page 16, after the second full paragraph ending in (See *Jungers*, *supra*, 127 Cal.App.4th at p. 705), add new paragraphs as follows:

In reaching our decision, we are mindful of the potential risks A.H. is facing in continuing in her marital relationship with defendant, in light of the serious and violent nature of the domestic violence incident that is the subject of the instant case and defendant's failure to engage meaningfully in and complete, on at least two occasions, a 52-week anger management program. We also recognize that this court has no jurisdiction over A.H., as the record shows she has been opposed from the outset of this case to the issuance of the CPO.

As such, we recognize the limitations of our holding in this case, which seeks to balance the martial rights of defendant and A.H., on one side of the scale,

against our Legislature's desire to protect A.H. from further incidents of domestic violence, on the other side. Candidly, as was the case in the trial court, this court is concerned about A.H.'s welfare under the circumstances of this case. But in the end, it is *her* decision whether to continue having contact with defendant. Of course, if there are additional facts that have arisen after the record and this appeal were filed, defendant and/or A.H. are free to seek additional relief, if any, in the trial court to maintain this balance of competing interests.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

BENKE, Acting P. J.

Copies to: All parties

2

Filed 11/30/17 (unmodified version)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D071560 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF36531) |
| MARCO ANTONIO SANDOVAL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Christopher J. Plourd, Judge. Affirmed as modified.

Benjamin B. Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Tami Falkenstein Hennick and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

An information charged defendant Marco Antonio Sandoval with inflicting corporal injury on a spouse resulting in a traumatic condition (Pen. Code,[1] § 273.5, subd. (f)(1), count 1) and making a criminal threat (§ 422, subd. (a), count 2).  The information alleged defendant had suffered two prison (§ 667.5, subd. (b)) and two strike (§§ 667, subds. (b)-(j) & 1170.12) priors.  The offenses arose out of an incident on May 23, 2016, in which defendant punched his wife, A.H., choked her to the point of unconsciousness, and threatened to kill her if she left him.

On September 23, 2016, defendant pleaded no contest to count 1 and admitted one prison prior.  The plea included a stipulated five-year upper term, suspended; three-years felony probation; and a dismissal of count 2 and all additional allegations in the information.  At the October 14 sentencing, over the objections of defendant *and* A.H., the court reissued a criminal protective order (CPO) using Judicial Council form CR-160 preventing defendant from initiating any contact whatsoever with A.H. for three years.

Defendant's sole contention on appeal is that the court erred in refusing to terminate the CPO or otherwise modify it to allow some contact between him and A.H.  Respondent the People agree with defendant and request that this case be remanded to allow the trial court to consider a more narrowly tailored protective order.

As we explain, we affirm the CPO with a minor modification.  We conclude the court properly exercised its broad discretion under section 1203.097, subdivision (a)(2) when it issued the CPO preventing *defendant* from initiating any contact whatsoever with

---

[1]     All further statutory references are to the Penal Code, unless otherwise specified.

2

A.H., pending a showing by defendant that he was making at least some progress in addressing his anger management issues and drug addiction, a showing he had yet to make on this record. However, we further conclude the CPO should be modified to allow *A.H.* to initiate contact, if any, with defendant that is acceptable and welcomed by *her*.

OVERVIEW

The CPO was initially issued by the court on August 8, 2016. It required defendant to avoid any "personal, electronic, telephonic, or written contact" with A.H., including through a third-party (except an attorney of record), and to stay more than 100 yards away from her (sometimes collectively, stay-away provision). It was reissued three days later, on the same terms.

At the September 23 hearing, the prosecutor noted for the record that he was agreeing to the plea in part because A.H. had been "very uncooperative" at the August 19 preliminary hearing when, over the People's objection, she invoked her alleged Fifth Amendment privilege against self-incrimination. At the conclusion of the hearing, the court asked the probation department to make a recommendation at the upcoming sentencing whether the CPO should remain in effect.

The October 6 probation report noted that in late September A.H. requested that the CPO be lifted. The report further noted that A.H. advised probation that she intended to appear at the October 14 sentencing and request the termination of the CPO; that she and defendant had been working on their marriage and she believed it was in "God's hands"; and that she had not wanted the CPO issued in the first instance. The probation report recommended that defendant be ordered not to "annoy, harass, or threaten" A.H.

3

either "personally or through a third party," ostensibly what defendant refers to as a "good conduct order," but stopped short of recommending there be no contact whatsoever between defendant and A.H.

At the October 14 sentencing, A.H. asked the court to terminate the CPO. In so doing, she stated that she had known defendant for 25 years; that they were high school "sweetheart[s]" and had "reconnected" about three years ago; and that they had been married for over a year. A.H. also informed the court that she had an associate's degree and was one year away from obtaining her bachelor degree in business administration; that she had the support of her church, her pastor, and her "woman's cell groups"; that other than the two domestic violence incidents, there had been no other occurrences of "abuse" between her and defendant, including during a "cool-down period" between the May 23 incident and defendant's arrest in early August; and that she had a "safety plan" in place if "things g[o]t out of control in the future," as her sister lived only two doors down.

The court noted A.H. appeared to be "very stable" and a "very good person," but expressed concern for her welfare absent the CPO because the instant offense was "very serious," and defendant had yet to enroll in anger management classes and show he was making progress. The defense argued rather than imposing the CPO that prevented any contact between defendant and A.H., the court instead should impose a good conduct order, as noted, which the defense represented was also what A.H. wanted. The defense further argued that the stay-away provision in the CPO violated his and A.H.'s constitutional rights to marital privacy and family associations. The court kept the CPO

4

temporarily in place, asked for further briefing from the parties and a supplemental report from probation, and set the matter for hearing on November 4.

The probation department's November 1 supplemental report stated defendant admitted "consuming methamphetamine" on October 30. Defendant also had yet to enroll in a 52-week certified anger management program. As a result, the November 1 report recommended that the CPO remain intact and that a hearing be set in late December to review defendant's progress.

Defendant's brief in support of his motion for termination or modification of the CPO argued the prior domestic violence incident that took place in October 2014, resulted in him pleading no contest to a mere misdemeanor violation of section 273.5, subdivision (a); that when the CPO issued in the instant case, it was without any input from A.H.; that A.H. believed the police officer report concerning the May 23 incident contained exaggerations and untruthful information about what had taken place; and that defendant and A.H. had lived together peacefully as husband and wife after the incident.

At the November 4 hearing, the defense informed the court that defendant had enrolled in, but not yet started, an anger management program. The defense argued section 1203.097, subdivision (a)(2), discussed in detail *post*, gave the court the discretion to impose a good conduct CPO without any "residence exclusion or stay-away conditions."

The court denied defendant's request to terminate or modify the CPO to allow him some contact with A.H. In so doing, it found that the real problem in this case was defendant's "long-standing" substance abuse, as both domestic violence incidents

5

centered around defendant and his drug use; that defendant continued to abuse drugs, including as recently as October 30 when he admitted using methamphetamine; and that defendant's ongoing drug use and anger management issues were a "very strong red flag" that something else could potentially happen to A.H.

Near the conclusion of the hearing, the court encouraged defendant to appeal the issue of whether A.H.'s desire to have contact with him "trump[ed] the statutory analysis" required for domestic violence victims. The court set the matter for hearing in 90 days and suggested defendant attend anger management classes and stay sober, all of which it noted would "go a long way to convincing the court that it's an appropriate modification" of the CPO.

The record shows the probation department, postappeal,[2] filed a February 2, 2017 update informing the trial court that defendant had reenrolled in a 52-week anger management course on January 4; that defendant had attended four of the five scheduled sessions; that defendant had failed to attend the February 1 class "without a valid excuse"; and that the program director had reported defendant did not take the program seriously and had been a "constant disruption" in class. At the February 2 hearing, the court refused to modify the CPO and set a review hearing for May 2017.

At the May 3 hearing, the defense informed the court of defendant's termination from the anger management and "GEO Reentry Services" programs. The court summarily revoked defendant's probation and issued a bench warrant for his arrest. The

_____

[2] A supplemental clerk's transcript was included in the appellate record.

6

May 8 petition to revoke probation stated that defendant also had tested positive for methamphetamine on November 1 and December 1, 2016, and on February 2, 2017; and that defendant thereafter had failed to contact or report to probation as required.

DISCUSSION

A.  *Governing Law*

We note the challenged stay-away provision in the CPO, preventing defendant from having any contact with A.H., is *not* technically a condition of his probation but instead was issued under section 1203.097 governing domestic violence.  Subdivision (a) of this statute provides in relevant part:  "If a person is granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code,[3] the terms of probation *shall* include all of the following:  . . . (2) A criminal court protective order protecting the victim from further acts of violence, threats, stalking, sexual abuse, and harassment, *and, if appropriate,* containing residence exclusion or stay-away conditions."  (Italics added.)

As noted, defendant pleaded no contest to a violation of section 273.5, subdivision (f)(1).  This subsection applies when an individual has been convicted of violating "this section for acts occurring within seven years of a previous conviction" under subdivision (a) of section 273.5 among other statutes.  Subdivision (a) in turn provides it is a felony for any person to "willfully inflict[] corporal injury resulting in a traumatic condition

---

3    Section 6211, subdivision (a) of the Family Code defines "[d]omestic violence" to include "abuse perpetrated against . . . [a] spouse or former spouse."

7

upon a victim described in subdivision (b)"; "victim" is defined in subdivision (b) to include a defendant's "spouse or former spouse" (§ 273.5, subd. (b)(1)).

Finally, subdivision (g) of section 273.5 is also implicated in this case. It provides: "If probation is granted to any person convicted under subdivision (a), the court *shall* impose probation *consistent with the provisions of Section 1203.097*." (Italics added.)

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.]" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265 (*Cornett*); *People v. Overstreet* (1986) 42 Cal.3d 891, 895 [noting when "statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it"].)

Here, we conclude from the plain language of subdivision (a)(2) of section 1203.097 that a court has the discretion to impose a "residence exclusion" and/or a "stay-away condition" when "appropriate." (*Cornett*, *supra*, 53 Cal.4th at p. 1265.) Factors a court may consider in determining whether one or more of such conditions are "appropriate" include "the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family." (§ 273.5,

8

subd. (j); see *People v. Blackburn* (2015) 61 Cal.4th 1113, 1123 [noting in giving words their " 'usual and ordinary meaning,' " a reviewing court construes " 'them in light of the *statute as a whole and the statute's purpose*' " (italics added)].)

We further conclude the same rules generally applicable to a challenge to a condition of probation also apply to a challenge to a CPO issued under section 1203.097, subdivision (a)(2) when a defendant is on probation for violation of section 273.5. (See § 273.5, subd. (g) [requiring *consistency* between a grant of probation for a violation of subdivision (a) of section 273.5 and the provisions of section 1203.097].) Thus, we conclude the terms of a CPO issued under section 1203.097, subdivision (a)(2) must be both reasonable and narrowly tailored to accomplish the state interests in reforming and rehabilitating the defendant offender, while at the same time protecting his or her victim from domestic violence. (See *People v. Jungers* (2005) 127 Cal.App.4th 698, 704 (*Jungers*).)

B. *The CPO Was Reasonable*

A condition of probation will be upheld unless it (1) has no relationship to the crime of which the defendant was convicted, (2) relates to conduct that is not criminal, *and* (3) requires or forbids conduct that is not reasonably related to future criminality. (*People v. Olguin* (2008) 45 Cal.4th 375, 379–380 (*Olguin*); see *People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*).) Our high court has clarified that this "test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term." (*Olguin*, at p. 379.) "Generally, we review the court's imposition of a probation condition

9

for an abuse of discretion." (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143 (*Shaun R.*).)

Here, we conclude the requirement in the CPO that defendant avoid all contact with A.H. was both reasonable and "appropriate" under 1203.097, subdivision (a)(2) as it was directly related to defendant's conviction on count 1 and also to his future criminality. (See *Olguin*, *supra*, 45 Cal.4th at pp. 379–380; see also *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

Indeed, in pleading no contest on count 1, defendant admitted to "willfully inflict[ing]" corporal punishment on A.H., causing her to suffer a "traumatic condition" as defined by statute. (See § 273.5, subds. (a) & (b); see also subd. (d) [defining "traumatic condition" to include an injury resulting from "strangulation or suffocation, whether of a minor or serious nature, caused by a physical force"].) This crime also violated subdivision (f)(1) of this statute, as it was defendant's *second* qualifying offense against A.H. in about a two-year period. (See *id.*, subd. (f)(1) [noting this subdivision applies if it is a defendant's second conviction for domestic violence under subdivision (a) within a *seven-year* period].)

But there's more. The record shows the trial court was concerned for A.H.'s safety and welfare because defendant repeatedly violated the terms of his probation, including by failing to participate meaningfully in at least two separate 52-week anger management programs and by testing positive for methamphetamine month after month. The court noted the strong connection between defendant's drug use and the incidence of domestic violence against A.H.

10

On this record, we conclude the stay-away provision in the CPO requiring *defendant* avoid all contact with A.H. for three years was "appropriate" under subdivision (a)(2) of section 1203.097, as it was reasonably related to the goals of protecting A.H. from further incidents of domestic violence while at the same time incentivizing defendant to engage in services to prevent or reduce the likelihood of further incidents of such violence. (See *Lent*, *supra*, 15 Cal.3d at p. 486; see also § 273.5, subd. (j).).

C. *The CPO was Constitutionally Valid*

Particularly germane to the instant case, "[j]udicial discretion to set conditions of probation is further circumscribed by constitutional considerations." (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1356 (*O'Neil*).) A probation condition that imposes limitations on a person's constitutional rights, including the right to "free association and marital privacy" (see *Jungers*, *supra*, 127 Cal.App.4th at p. 704), both of which are potentially implicated in the instant case, should "closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) "Certain intrusions by government which would be invalid under traditional constitutional concepts may be reasonable at least to the extent that such intrusions are required by legitimate governmental demands." (*In re White* (1979) 97 Cal.App.3d 141, 149–150.)

"The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such

11

matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.) We independently review constitutional challenges to a probation condition. (*Shaun R.*, *supra*, 188 Cal.App.4th at p. 1143.)

This court's *Jungers* opinion informs our analysis on this issue. There, the defendant pleaded no contest to committing corporal injury on the victim, the mother of his child, in violation of section 273.5, subdivisions (a) and (b)(4). The defendant was granted probation, one of the conditions being he could have only "mutual" contact with the victim. (*Jungers*, *supra*, 127 Cal.App.4th at p. 701.) After violating probation by, among other things, contacting or attempting to contact the victim, the court ordered that defendant have no contact with her, stating that the victim could contact defendant, but defendant could not contact her. The defendant later married the victim and like the defendant in the instant case, filed a motion to modify what he referred to as a condition of his probation restricting association between them. The motion included a declaration from the victim wife stating that she "wanted to have contact with her husband" while he was in a residential treatment program and that she "did not fear for her safety." (*Id.* at p. 701.)

The trial court in response "clarified its ruling" by stating that the order did not preclude any contact between the defendant and his wife but instead precluded *him* from *initiating* that contact. (*Jungers*, *supra*, 127 Cal.App.4th at pp. 701–702.) Specifically, the trial court ruled the victim "can contact [the defendant]. He cannot contact her. He cannot initiate contact. She can write to him. He may not write her. She can call him. He may not call her. She can visit him at [the residential treatment program]. He may

12

not go to her home." (*Ibid.*) Like the defendant in the instant case, the defendant in *Jungers* argued on appeal that this restriction violated *inter alia* his right to association and to "marital privacy." (*Id.* at pp. 700–706.)

In affirming this order, we concluded the defendant's "reasonable expectations of free association and marital privacy" were necessarily restricted because of his felony conviction for domestic violence. (*Jungers*, *supra*, 127 Cal.App.4th at p. 704.) We further concluded this restriction was thus valid because it was reasonably necessary to accomplish the needs of the state and it was narrowly tailored to accomplish this goal. (*Ibid.*)

In addressing the state's needs and interest, we recognized in *Jungers* that elimination of domestic violence was a "compelling state interest": "Consistent with the Legislature's response to the problem of domestic violence, section 273.5 punishes a defendant who inflicts corporal injury on a spouse. . . . 'The statute reflects legislative recognition of the high incidence of violence in intimate relationships and the state's interest in encouraging nonviolent intimate relationships.' " (*Jungers*, *supra*, 127 Cal.App.4th at pp. 703–704.) We further recognized that when a defendant convicted of domestic violence is granted probation, as was the case here, the terms of probation "shall" include a CPO issued pursuant to section 1203.097, subdivision (a)(2), even if the victim did not fear for his or her safety and did not want such an order, as is *also* the case here. (See *Jungers,* at pp. 704–705, fn. 3 [noting that "victims of domestic violence often remain in abusive relationships" and that "domestic violence statutes are meant to protect 'victims from participation or complicity in their own predicament' "].)

13

We thus found in *Jungers* that, although the court's order curtailed the defendant's rights of association and marital privacy, "it legitimately and reasonably operated to accomplish the needs of the state in addressing domestic violence by rehabilitating [the defendant] and protecting [the victim]." (*Jungers*, *supra*, 127 Cal.App.4th at p. 705.) As such, we further found the state's compelling interest in protecting victims of domestic violence justified the restriction on the defendant's right to initiate contact with the victim. (*Ibid.*)

Finally, *Jungers* found the protective order was also narrowly drawn because it "did not impose a complete ban on association or marital privacy, but only a narrowly tailored condition consistent with [the defendant's] rehabilitation and the safety of the victim." (*Jungers*, *supra*, 127 Cal.App.4th at p. 705.) Thus, unlike the CPO at issue in the instant case, the protective order in *Jungers* allowed the victim to initiate contact with defendant on terms acceptable to her even if the defendant could not initiate contact with the victim. (*Ibid.*) As such, we concluded in *Jungers* that the protective order was a "reasonable restriction on the *manner* in which [the defendant] may communicate with [the victim]" (*ibid*), and that therefore the order did "not interfere with [the defendant's] martial relationship to an impermissible degree" (*ibid.*).

It can hardly be doubted that elimination of domestic violence and the protection of its victims such as A.H. are a compelling state interest. (See *Jungers*, *supra*, 127 Cal.App.4th at pp. 703–704.) We also note the trial court was *required* to issue a CPO, although the court could exercise discretion on its terms, even if A.H. did not want protection in the first place. (See § 273.5, subd. (g) & 1203.097, subd. (a)(2).)

14

Here, as already noted defendant made little, if any, progress in addressing his anger management issues and drug abuse after the CPO and its stay-away provision went into effect.  Not only did he continually violate the terms and conditions of his probation as a result, but his behavior—and the risks it potentially presented to A.H.—were even more concerning given his lengthy criminal history, which consisted of 13 felony, and seven misdemeanor, convictions (the instant offense being his 13th).  Finally, the instant offense against A.H. was "very serious" and involved violence, as also noted by the trial court.

We thus independently conclude under the facts of this case that the state interest in protecting A.H. from further incidents of domestic violence justified the intrusion on defendant's rights of association and marital privacy by limiting *his* ability to initiate contact with A.H.  (See *Jungers*, *supra*, 127 Cal.App.4th at p. 704; see also § 273.5, subd. (j) [noting that when convicted under subdivision (a) of this statute, a court "shall also consider issuing an order *restraining* the defendant from *any contact* with the victim, which may be valid for up to 10 years, as determined by the court]", italics added.)

The question becomes whether the CPO at issue here was narrowly drawn.  We note the CPO is silent on whether A.H. may initiate contact with defendant, in contrast to the order at issue in *Jungers* that expressly allowed the victim wife to contact her offender husband.  Although there is no prohibition in the CPO preventing A.H. from contacting defendant on terms that are acceptable and welcomed by her, we note her doing so and defendant's *response* to such contact likely would result in a violation of the CPO.

15

Following *Jungers*, we thus modify the CPO at issue to clarify that A.H. may *initiate* contact with defendant but not vice-versa. Thus, if A.H. writes defendant, defendant may write back. Defendant, however, may not initiate written contact with A.H. If A.H. calls defendant and he does not answer the call, defendant may call her back; but he cannot initiate telephone contact with A.H. Likewise, A.H. may visit defendant at his home, but defendant cannot initiate contact and visit A.H. at her home.

Modified accordingly, the CPO will not preclude all future contact between defendant and A.H., but rather limit the *manner* in which such contact may take place in order to protect A.H. from further incidents of domestic violence and to incentivize defendant to participate in programs designed to reduce or eliminate any such future incidents. (See *Jungers*, *supra*, 127 Cal.App.4th at p. 705.)

DISPOSITION

We direct the trial court to modify the CPO it issued on October 14, 2016, to allow A.H. to initiate contact with defendant on terms acceptable to and welcomed by her, as discussed in this opinion.  However, the portion of the CPO preventing defendant from initiating contact with A.H. shall remain in effect until otherwise directed by the trial court or until the CPO expires.

BENKE, Acting P. J.

WE CONCUR:


NARES, J.


HALLER, J.

17